**Kendrick Dewayne STEWART,
Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 01–02–00945–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

April 1, 2004.

Danny K. Easterling, Easterling & Easterling, P.C., Houston, TX, for Appellant.

Jessica D'Anna, Assistant District Attorney, William J. Delmore, III, Chief Prosecutor, Appellate Division, Charles A. Rosenthal, Jr., District Attorney—Harris County, Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, ALCALA, and HANKS.

## OPINION

ELSA ALCALA, Justice.

Appellant, Kendrick Dewayne Stewart, was indicted for capital murder. The indictment alleged that, while in the course of committing and attempting to commit the offense of retaliation against James Pienta, appellant intentionally caused the death of Pienta by shooting him with a deadly weapon, namely, a firearm. Appellant pleaded not guilty. A jury convicted appellant, and the court sentenced him to an automatic sentence of life imprisonment. TEX. PEN.CODE ANN. § 19.03(a)(2) (Vernon Supp.2004). In two issues, appellant challenges the legal and factual sufficiency of the evidence to support the retaliation element of capital murder. We affirm.

## Background

Apartment C had been vacant for about five days, and had been vandalized by unknown persons a few days before August 10, 2001, causing damage to the doors, kitchen appliances, window, and upstairs area of the apartment. The owner of the apartment building, Joseph Martin, reported the vandalism to the Houston Police Department and contacted James Pienta, a maintenance man who had previously done work for Martin, to inspect the apartment and provide an estimated cost for repairs. The next day, Pienta and Martin met at Martin's home and drove to the vandalized apartment in separate vehicles. They arrived at the apartment between 10 and 11 a.m. When Martin unlocked and opened the door to the vandalized apartment, he discovered that appellant had trespassed

inside and was asleep on a mattress on the floor.

Martin and Pienta woke appellant by pushing on the mattress and questioned him about his presence in the apartment and his knowledge of the vandalism. Appellant said that he had entered the apartment by jumping the fence and that he was spending the night in the apartment. He also claimed that he knew who had vandalized the apartment. When Martin asked appellant for identification, he denied having any. After Martin told appellant, "we better take your ID, otherwise you are in trouble," appellant retrieved his Texas identification card from his shoes and gave it to Martin. Martin then told appellant and Pienta, "Let me make a call. I want to tell the police somebody inside the building [sic]," and said that he would return. Martin left Pienta alone in the apartment with appellant.

Martin went to apartment B, received permission to use the phone from 13–year-old Kenneth Kinmon, and telephoned 911 to request police assistance. While Martin was still upstairs using Kinmon's telephone, Kinmon saw appellant walking from apartment C carrying a duffle bag. Appellant's face appeared angry. Kinmon asked appellant why he was mad, and appellant said, "I shot somebody." Appellant changed his clothes by putting on different shorts and gave Kinmon the duffle bag, with instructions to take the bag to Kinmon's apartment.

As Martin was leaving Kinmon's apartment after using the telephone, Martin saw appellant run in the opposite direction from the vacant apartment. Martin recognized appellant's bag because he had seen it inside the vandalized apartment earlier that day and took it from Kinmon, stating that he would give the duffle bag back to appellant.

On returning to the vandalized apartment and opening the door, Martin discovered Pienta lying on the floor in a pool of blood. Martin dropped the duffle bag and ran back to apartment B to telephone 911. After placing that call, Martin and a group of people began to return to apartment C, where they encountered appellant outside the apartments. Appellant was walking away from the apartments and stared at Martin when they saw each other. Martin returned to apartment C to await the police.

When appellant left apartment C after the shooting, he spoke to several of his friends who lived nearby and told them that a police officer had been shot. Friends of appellant saw him in possession of Pienta's wallet and keys. Appellant paid a "crackhead" nine dollars to bring Pienta's van from where it was parked near apartment C to Gerale Broussard's house, where appellant went after the shooting. Later that day, police officers discovered that Pienta's van had been burned through arson. Appellant was arrested the same day as the murder after he sought treatment for burns to his body at a hospital, where he appeared, emitting an odor of gasoline. After his arrest, appellant gave a tape-recorded statement to D.S. Null, a peace officer assigned to the homicide division of the Houston Police Department. In that statement, appellant claimed that another individual, Brian Scott, had killed Pienta.

The autopsy established that Pienta was killed by a single gunshot wound to the head above the left eye by a firearm that was a greater distance than one and a half to two feet away from Pienta's body. The blood splatter evidence established that Pienta was standing about three feet away from the front door of the apartment when he was shot.

### Sufficiency of the Evidence

■ Appellant's two issues on appeal challenge the legal and factual sufficiency of the evidence to support the retaliation element of capital murder. In assessing legal sufficiency, we determine whether, based on all of the record evidence, viewed in the light most favorable to the verdict, a rational jury could have found the accused guilty of all of the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex.Crim.App.2003). In conducting our review of the legal sufficiency of the evidence, we do not reevaluate the weight and credibility of the evidence, but ensure only that the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim.App.1993).

■ In reviewing factual sufficiency of the evidence, we consider all of the evidence in a neutral light. *Swearingen*, 101 S.W.3d at 97. We must reverse a conviction if the proof of guilt is so weak as to undermine confidence in the jury's determination, or if the proof of guilt, although adequate if taken alone, is greatly outweighed by the proof of innocence. *Id.* Although we may disagree with the jury's verdict, we must defer to the jury's determination of the weight and credibility of the evidence and will reverse the jury's verdict only to avoid manifest injustice. *Id.* When reviewing the sufficiency of evidence, we remain mindful of the jury's role as the exclusive judge of the credibility of witnesses and the weight to give their testimony. *Jones v. State*, 944 S.W.2d 642, 648 (Tex.Crim.App.1996).

A person commits capital murder if he intentionally commits murder and intentionally commits the murder in the course of committing or attempting to commit the offense of retaliation. TEX. PEN.CODE ANN. § 19.03(a)(2) (Vernon Supp.2004). A person commits the offense of retaliation if he (1) intentionally or knowingly (2) harms or threatens to harm another by an unlawful act (3) in retaliation for or on account of the service or status of another (4) as either a public servant, witness, prospective witness or informant, or as a person who has reported or who the actor knows intends to report the occurrence of a crime. TEX. PEN.CODE ANN. § 36.06(a)(1) (Vernon Supp.2004).

■ Appellant does not challenge the sufficiency of the evidence to establish that he intentionally or knowingly killed Pienta by shooting him once in the head with a firearm. Accordingly, we do not address those elements on appeal. *See Urbano v. State*, 837 S.W.2d 114, 116 (Tex.Crim.App. 1992). Moreover, appellant has not challenged that Pienta was a prospective witness to appellant's trespassing offense. A "prospective witness" is one who may testify in an official proceeding. *See Morrow v. State*, 862 S.W.2d 612, 614 (Tex.Crim. App.1993). A person who witnesses an offense, but who has not yet testified in a trial involving that offense is also a prospective witness. *Id.* at 615; *see also Ortiz v. State*, 93 S.W.3d 79, 86 (Tex.Crim. App.2002) ("Any person who is involved in an offense with a defendant, who sees the defendant committing an offense, or who hears the defendant discuss committing an offense is a 'prospective witness' in the prosecution of that defendant because he 'may' testify."). For Pienta to be a prospective witness, it was not required that any official proceedings for trespass or vandalism be initiated. *See Morrow*, 862 S.W.2d at 615. We conclude that, because Pienta witnessed appellant's trespass, Pienta was a prospective witness who might have been called to testify in any future criminal proceedings against appellant. *See id.* at 614. Pienta was also a

prospective reporter of the offense because he was a person who, appellant knew, intended to report the occurrence of appellant's trespassing crime to the police, once they appeared at the apartment following Martin's telephone call to 911. *See* TEX. PEN.CODE ANN. § 36.06(a)(1)(B) (Vernon Supp.2004). Given Pienta's status as a prospective reporter of the offense and a prospective witness in any court proceeding, he was entitled to the special protections of the retaliation statute. *See Webb v. State,* 991 S.W.2d 408, 415 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd) ("The State of Texas has a valid and substantial interest in protecting the integrity of its judicial system and in allowing public servants, witnesses, and prospective witnesses to perform their respective duties without interference from threats of physical violence.")

■ Appellant's entire sufficiency challenge pertains to the element in the retaliation offense that required the State to prove that the murder occurred "in retaliation for or on account of the service or status" of Pienta as both a prospective reporter and prospective witness regarding appellant's trespass into the apartment. *See* TEX. PEN.CODE ANN. § 36.06(a)(1). Retaliatory intent may be inferred from an accused's acts, words, or conduct. *Dues v. State,* 634 S.W.2d 304, 305 (Tex. Crim App. [Panel Op.] 1982); *See also In re B.P.H.,* 83 S.W.3d 400, 407 (Tex.App.Fort Worth 2002, no pet.).

■ In challenging the sufficiency of proof for this element, appellant asserts that there are other possible reasons why he killed Pienta, other than in retaliation for or on account of Pienta's status or service as a prospective reporter or prospective witness. These include the following: (1) appellant needed to evade Pienta to escape from the apartment, (2) appellant wanted to steal Pienta's wallet and van, or (3) appellant may have not had any reason to harm Pienta and was "just mean." Appellant also asserts that Martin's testimony established that Martin believed that appellant had witnessed the vandalism, did not feel he had grounds to keep appellant in the apartment against his will, and would not have pursued criminal charges against appellant. Moreover, according to appellant, it would be nonsensical for him to kill Pienta in retaliation for or on account of his status or service as a prospective reporter or prospective witness, because Martin, who was also a reporter of the offense and prospective witness, had taken appellant's identification and would still have been available to testify. Relying on *In re M.M.R.* and *Riley v. State,* appellant contends that the evidence is legally insufficient. *See In re M.M.R.,* 932 S.W.2d 112, 114–15 (Tex.App.-El Paso 1996, no pet.) (holding evidence legally insufficient to prove that security guard was injured in retaliation for or on account of status or service as a public servant under circumstances showing that M.M.R., who was juvenile detainee involved in altercation with another detainee, struck guard when guard attempted to stop that assault; evidence established that M.M.R. struck guard not to retaliate against guard for restraining appellant, but to escape and continue assault against another juvenile); *Riley v. State,* 965 S.W.2d 1, 2 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd) (holding that evidence legally insufficient to prove that security guard injured in retaliation for or on account of status or service as public servant under circumstances showing that prison inmate, appellant, walked past central control desk, ignored commands to return to desk, and injured guard who tried to block appellant from leaving).

In contrast to *In re M.M.R.* and *Riley,* the record in this case contains extensive

evidence, both from appellant and from the circumstances of the offense demonstrating that Pienta was killed in retaliation for or on account of his service or status as a prospective reporter and prospective witness. *See In re M.M.R.*, 932 S.W.2d at 114–15; *Riley*, 965 S.W.2d at 1.

In the time interval between shooting Pienta and leaving in Pienta's van, appellant spoke to three friends about why he shot Pienta. Sixteen-year-old Billy Anderson testified that appellant said "he had shot some dude ... they walked in on him while he was [a]sleep and they had his ID card." Fourteen-year-old Gerale Broussard testified that he heard appellant say that "he was sleeping in the vacant apartment and two men came and woke him up. And one of the men left to go call the police and the other one stayed, and he was trying to like hold him inside, and that is when he shot him." Kevin Anderson, who was 17 years old, testified that appellant said that "he didn't want to do it, and he had to shoot a man." Anderson further testified that appellant told him the following:

> [H]e woke up, the owner and the maintenance man had stepped in the apartment and the owner asked him for his ID. Owner left outside the apartment, went to go and call the police. And Kendrick was asking the custodian can he leave out of the house, but the custodian would not allow him to leave the house. So he pulled his weapon, tried to take the first shot, but I guess the gun jammed or not, and he took the second shot. He said he shot him in the head.

Appellant told Anderson that the man was standing in front of the doorway to stop him from leaving and that, after shooting the man, appellant took his wallet, cash, and about 10 to 15 keys, grabbed his own possessions, and left.

Appellant's version of events in the tape-recorded statement to Officer Null contains direct evidence of appellant's state of mind at the time of the shooting. After Officer Null read appellant his statutory warnings, appellant waived his rights and gave a statement about the shooting. Appellant stated that Mrs. Anderson kicked him out of the apartment where he had been staying for having had sex with her daughter. Appellant acquired a mattress and spent the night in the vacant apartment until he was awakened by two men who questioned him about some damage to the apartment. After the landlord left the apartment, appellant tried to leave the apartment, but the "big guy" pushed him back. According to appellant, the "big guy" said that he was a police officer. Appellant claimed that Brian Scott, a friend of his, suddenly appeared in the apartment. Because the "big guy" wouldn't let appellant out of the apartment, Brian Scott pulled out a gun and shot the "big guy." Appellant left the apartment believing that he had shot a police officer. According to appellant, Brian Scott knew that appellant would be at the vacant apartment because appellant had nowhere else to go. Appellant, Scott, and a "crackhead," left together in the "big guy's" van, and Scott and the "crackhead" burned the van later that day.

After viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found that, after Pienta and Martin witnessed appellant as a trespasser in the apartment, Pienta attempted to hold appellant in the apartment while awaiting police, whose presence he expected at the apartment because Martin had summoned them by telephoning 911. A rational jury could have found that Martin's statement, "I want to tell the police somebody inside the building [sic]," alerted both Pienta and appellant that Martin would be pursuing

trespass charges against appellant. Then, in an attempt to keep appellant in the apartment for the police, Pienta tried to block appellant from leaving the apartment. A rational jury could have determined that appellant pulled out a firearm and shot Pienta once in the head, in order to stop Pienta from (1) reporting to the police that he had found appellant inside the apartment and (2) testifying at any future trial.

A rational jury could have rejected appellant's claimed motives that he shot Pienta only to escape from the apartment, to steal Pienta's van and wallet, or for no reason at all. Regarding the latter claim, the evidence shows that appellant himself offered a reason for shooting Pienta. Within minutes of the crime, appellant told Kevin Anderson that he had to shoot the man, that he didn't want to do it, and that he had a specific purpose in causing the death of Pienta. A rational jury could also have determined that appellant stole Pienta's wallet and van as an afterthought to killing Pienta, given that appellant never mentioned to any of his friends or to the police that the theft of Pienta's property factored into his actions. Finally, a rational jury could have found that appellant could have easily escaped from the apartment by merely threatening Pienta with the firearm, rather than shooting him once in the head—an act that would surely cause Pienta's death. In his taped statement, appellant stated that Pienta said, "[D]on't shoot me" before he was shot, which suggests that Pienta would have complied with any demands by appellant to permit appellant, either to leave the apartment or to take Pienta's property without any further use of force. Thus, appellant's choice to shoot Pienta in the head after Pienta had submitted to appellant suggests that appellant wanted more than merely to escape from the apartment and take Pienta's property.

A rational jury could therefore have found, from the physical evidence, the circumstances of the offense, appellant's own statements concerning Pienta's actions when he was shot, and appellant's statements to others concerning his motives for shooting Pienta, that appellant shot Pienta not only to escape the apartment or to rob Pienta but, rather, to prevent Pienta from reporting the trespass to the police and possibly appearing at any future criminal proceeding. A rational jury could have concluded that there was no other explanation for appellant's killing Pienta from the circumstances of this offense.

Appellant contends that, because he knew that Martin still remained as a witness to the offense and that Martin had possession of appellant's identification, it would have been illogical for appellant to kill Pienta. There is no dispute, however, that appellant killed Pienta by shooting him once in the head. One could hardly argue that appellant was behaving logically that day, even under the circumstances as appellant portrays them, because appellant chose to kill a man by shooting him once in the head rather than go to jail to answer trespass charges punishable by a possible sentence of one year or less. That appellant did not kill all witnesses to the offense does not render irrational the jury's having believed that appellant killed Pienta in retaliation for or on account of his status or service as a prospective reporter or prospective witness.

■■■ Appellant's challenges to the factual sufficiency of the evidence reassert the same arguments as his legal-sufficiency complaint. The existence of an alternative reasonable hypotheses may be relevant to, but is not determinative of, a factual-sufficiency review. *Wilson v. State,* 7 S.W.3d 136, 141 (Tex.Crim.App. 1999). As discussed above, although alter-

native reasonable hypotheses exist in this case, we conclude that a jury could have reasonably rejected them and found that appellant shot Pienta in retaliation for or on account of his status or service as a prospective reporter and prospective witness. We remain mindful of the jury's role as the exclusive judge of the credibility of witnesses, the weight to be given their testimony, and the inferences that may be drawn from the evidence. *See Jones,* 944 S.W.2d at 648. Even if we were to disagree with the jury's verdict, we must defer to the jury's determinations that depend on assessments of the weight and credibility of the evidence, *see Swearingen,* 101 S.W.3d at 97, and we will not substitute our judgment for that of the jury. *See Clewis v. State,* 922 S.W.2d 126, 129, 133 (Tex.Crim.App.1996).

The proof of appellant's guilt in this case is neither so weak as to undermine the confidence of the jury's determination, nor greatly outweighed by the proof of appellant's innocence. *See id.* Accordingly, the evidence does not establish that a manifest injustice has occurred. *See Swearingen,* 101 S.W.3d at 97.

We conclude that the evidence is legally and factually sufficient to establish that appellant committed the murder of Pienta in retaliation for or on account of his service or status as a prospective reporter and prospective witness against him.

We overrule appellant's first and second issues.

### Conclusion

We affirm the judgment of the trial court.